*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0669**

State of Minnesota,
Respondent,

vs.

Chad Loran Siegel,
Appellant.

**Filed April 13, 2015
Affirmed
Connolly, Judge**

St. Louis County District Court
File No. 69DU-CR-13-1802

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Mark S. Rubin, St. Louis County Attorney, Scott A. Hersey, Special Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Sara J. Euteneuer, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Worke, Presiding Judge; Peterson, Judge; and Connolly, Judge.

## UNPUBLISHED OPINION

**CONNOLLY**, Judge

Appellant challenges his conviction of aiding and abetting first-degree assault,

arguing that the district court erred in failing to instruct the jury on accomplice testimony and on self-defense; he also challenges his sentence, arguing that the district court abused its discretion in sentencing him to a upward-double-durational departure because the facts found by the jury do not support the departure. Because we see no error in the jury instructions and no abuse of discretion in the sentencing departure, we affirm.

## FACTS

In April 2013, J.L. and three others, Terrance Yance, Jason Carlsness, and Melissa Martinson, were passengers in the vehicle of appellant Chad Siegel, who was driving them from Superior, WI, to Duluth, MN. J.L. was assaulted in the vehicle while it was moving; when appellant stopped, J.L. was pulled out, assaulted again, and left unconscious on the road as appellant drove away with the others. They returned and picked J.L. up, and appellant drove him first to a house in Duluth, then to a trailer in Superior, where he was left. Eventually, someone else drove J.L. to a hospital. He had suffered severe traumatic brain injury, required brain surgery, and has lost the ability to live independently.

As a result of the incident, appellant was charged with attempted second-degree murder, first-degree assault, and two counts of kidnapping.[1] Yance and Carlsness were also charged; Martinson was not charged.

The jury heard testimony from J.L.; from appellant; from the detectives who interviewed appellant and J.L. after the incident; from Martinson, who was required to

---

[1] At appellant's trial, his motion for a judgment of acquittal on the kidnapping counts was granted, and those counts were dismissed.

2

testify; from Carlsness, whose case was pending; and from Yance, who had pleaded guilty and exercised his right to remain silent, but whose police-interview transcript and guilty-plea hearing transcript were read into the record.

The jury found appellant not guilty of attempted second-degree murder but guilty of aiding and abetting first-degree assault. Appellant was sentenced to 172 months in prison, an upward-double-durational departure. He argues that the district court committed reversible error by failing to instruct the jury, sua sponte, on accomplice testimony and on self-defense, and that the district court abused its discretion in imposing the upward double-durational departure.

**D E C I S I O N**

**1.    Jury Instructions**

Because appellant neither requested nor objected to the omission of jury instructions on accomplice testimony and on self-defense, the standard of review is plain error. *State v. Reed*, 737 N.W.2d 572, 584 n.4 (Minn. 2007) ("[W]here a district court fails to give a required accomplice corroboration instruction and the defendant does not object, an appellate court must apply the plain error analysis."); *State v. Gustafson*, 610 N.W.2d 314, 320 (Minn. 2000) (rejecting view that district court, sua sponte, should have instructed on self-defense where defendant failed to request the instruction, failed to object to the failure to give the instruction, and did not argue self-defense at trial).

The plain error test requires

> that before an appellate court reviews an unobjected-to error, there must be (1) error; (2) that is plain; and (3) the error must affect substantial rights. If these three prongs are met, the

3

> appellate court then assesses whether it should address the error to ensure fairness and the integrity of the judicial proceedings.

*State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998) (citation omitted).

### A.     Accomplice Instruction

A conviction cannot be based on uncorroborated accomplice testimony. Minn. Stat. § 634.04 (2012). Appellant argues that the failure to give the jury this instruction resulted in the jury convicting him of aiding and abetting first-degree assault based on the testimony of his accomplices, Carlsness and Yance.[2] But the jury heard testimony from J.L., from appellant, and from law-enforcement personnel who interviewed them; that testimony corroborated the testimony of the accomplices and, viewed in the light most favorable to the verdict, was independently sufficient to support appellant's conviction. *See State v. Bowles*, 530 N.W.2d 521, 532 (Minn. 1995) (corroborating evidence of accomplice testimony is viewed in the light most favorable to the verdict).

After testifying that Yance pulled a gun and told him to get in appellant's vehicle, J.L. was asked, "[D]id you get into the vehicle. . . ?" and answered, "Well, yeah . . . I trust[ed appellant]." J.L. was asked, "[Y]ou said everyone was beating you?" and answered "Yep"; he was then asked, "What about [appellant]?" and answered, "[Appellant] did kick me." When asked, "Are you on the ground when [appellant] is assaulting you?" J.L. answered, "Well, yeah." After testifying that he knew of no reason

---

[2] Whether Martinson, who was not charged, was an accomplice is disputed, but irrelevant: her testimony was that, because she was outside the vehicle on the driver's side, she did not see the assault of J.L. when the great bodily harm was inflicted, which took place outside the vehicle on the passenger side.

why either Carlsness or Yance would be angry with him, he was asked, "Why would [appellant] be upset with you?" and answered, "[M]aybe he thought I burned his truck, but [C.B.] did that. I really didn't do that, [appellant]. I had nothing to do with that." The jury also heard J.L. testify that: (1) J.L. did not know the two men who were with appellant when appellant came to pick him up at a gas station in Superior; (2) Yance hit J.L. in the head with a tire iron while they were in the vehicle; (3) J.L. didn't remember who dragged him out of the vehicle; (4) J.L. lost consciousness several times; (5) J.L. knew his head and face were injured; (6) J.L. was left on the ground after the assault, and he was bleeding out of his eyes, ears, mouth, and head; (7) J.L. did not know why he was assaulted; and (8) J.L.'s last memory of the incident was being driven to the hospital.

A detective testified that he interviewed J.L. in August 2013, four months after the assault, because J.L. was unconscious or unable to speak prior to that time. The detective testified that J.L. said: (1) he was ordered by Yance at gunpoint to get into the vehicle; (2) he was immediately hit with something he thought was a tire iron while in the vehicle, and this made him dizzy and not alert; (3) he believed appellant was angry with him because appellant thought J.L. had something to do with his truck being burned; (4) Yance and Carlsness punched him alternately while appellant was driving; (5) appellant turned around and began punching him as well after the car stopped; (6) he was eventually dragged out of the truck; and (7) "[appellant] smashed his head against the side of the truck repeatedly saying that he was going to kill him."

Appellant testified on direct examination that: (1) he met J.L. in Superior earlier on the day of the assault, and they drove to Duluth to pick up a truck of appellant's so

they could swap its tires; (2) appellant asked J.L. if J.L. had been bragging about burning appellant's truck and J.L. said no; (3) appellant "had a problem" with someone saying J.L. was bragging about burning the truck; (4) they got started swapping the tires, with J.L. doing a lot of the work; (5) appellant left to pick up Yance and Carlsness, then returned with them; (6) J.L. and Martinson left to take the truck to Superior; (7) appellant got everyone something to eat; (8) they smoked "some weed," and he and Carlsness were then doing methamphetamine; (9) Martinson called and said she and J.L. were ready to be picked up at a gas station in Superior; (10) appellant, Yance, and Carlsness went to get them, and they got in the back seat with Carlsness; (11) J.L. and Carlsness began fighting in the back seat; (12) appellant stopped the car and went around it to open the passenger-side rear door, and Martinson got out; (13) appellant saw J.L.'s right hand take a little folding knife from his coat pocket; (14) appellant grabbed J.L.'s right wrist, pushed him against Carlsness, and tried to wrestle the knife away; (15) appellant "may have hit" J.L. a couple of times when he was trying to get the knife; (16) J.L. was pulled out of the car past appellant through the passenger-side rear door; (17) Carlsness got out of the driver's side rear door; (18) appellant was then the only person still in the vehicle and saw Yance stomping on J.L., who was on the ground outside; (19) appellant told Yance to stop and pushed Yance away from J.L.; (20) everyone except J.L. got back in the vehicle and drove away; (21) when appellant realized J.L. was not with them, he drove back and, with Carlsness, picked up the unconscious J.L.; (22) appellant drove to the nearest house he knew, took J.L. into it, and tried to clean him up; (23) appellant, Yance, and Martinson

6

agreed to take J.L. to the trailer home of a friend in Superior so he could lie down; and (24) appellant left Martinson and J.L. at the trailer home and drove away with Yance.

On cross-examination, appellant testified that he did not call for help for J.L. because he panicked, that he had told J.L. to get out of town earlier that day, and that the blade on J.L.'s knife was never extended.

Two detectives, one from Wisconsin and one from Minnesota, had interviewed appellant and testified at his trial. The Wisconsin detective testified that appellant told him: (1) appellant thought J.L. had been involved in burning the vehicle because J.L. had been bragging about it, and appellant was bothered by this; (2) fighting began in the vehicle and Carlsness punched J.L.; (3) when they stopped, J.L. was dragged out of the vehicle; (4) appellant, Yance, and Carlsness then beat up J.L.; (5) appellant hit J.L. "at least twice" before J.L. was removed from the vehicle; (6) appellant participated in the assault and then tried to stop the attack on J.L.; (7) after the assault, when J.L. was unconscious on the side of the road, the others got back in the vehicle, and appellant drove away; (8) after driving about a half mile, appellant and Carlsness decided to return for J.L.; (9) J.L. was taken to a house in Duluth, then to a trailer in Superior, where they left him; (10) the beating was a payback for J.L. setting fire to appellant's vehicle or being involved in stealing some of appellant's property. On cross-examination, the detective testified that appellant said he joined the fight because he thought J.L. was trying to pull a knife, he tried to stop Yance from stomping J.L., and he participated in beating up J.L. but did not do "as much as [Yance did.]"

The Minnesota detective had recorded his interview of appellant, and the tape was played for the jury. During the interview, appellant said, "I hit him [J.L.] twice" but also said that, when he got out of the truck, he said "That's enough." Appellant agreed that, although he hardly knew Yance, he went around with him, and that he had just met Carlsness. When asked why he had a group of people that hardly knew one another in his vehicle, appellant said it was "bad timing." When asked what his intention was in getting J.L. and the others into his vehicle, appellant said, "I just wanted to find out if he [J.L.] burnt my truck . . . ." When asked why he did not do that in the gas station parking lot, appellant said, "I guess I could've. . . . [J.L.] was with me earlier in the day, too." Appellant said he thought J.L. was "maybe going for a knife," but appellant never saw the knife open, and no one else mentioned seeing a knife on J.L. that night. Neither detective indicated that appellant said he and the three others inadvertently left J.L., bleeding and unconscious, at the side of the road when they drove off after assaulting him.

After the tape of the interview was finished, the detective answered "Yes" when asked if appellant said the only person who had reason to be upset with J.L. was himself. The detective also testified that appellant said his own involvement was that he "looked back and saw that [J.L.] was going for a knife, so he stopped the truck and punched J.L. one or two times." On cross-examination, the detective said he did not think it possible that appellant, while driving, had seen J.L., in the back seat going for a knife, but said that was what appellant had told him.

8

Thus, the jury heard testimony from those who were not accomplices, i.e., appellant, J.L., and the detectives, that: (1) appellant arranged matters so that two other men not known to J.L. were with him when he picked up J.L.; (2) no one except appellant had reason to be angry with J.L.; (3) appellant drove the vehicle while J.L. was being hit in the head with a tire iron; (4) appellant hit J.L., shoved him into the vehicle door, and kicked him; (5) appellant drove away leaving J.L. bleeding and unconscious on the side of the road; and (6) appellant knew J.L. was bleeding and losing consciousness but did not seek medical help for him.

Thus, the jury had ample evidence from the testimony of J.L., of appellant, and of the detectives who interviewed them to support its verdict that appellant was guilty of aiding and abetting first-degree assault without considering the evidence provided by Carlsness and Yance, and the failure to instruct the jury that appellant could not be convicted based solely on the testimony of Carlsness and Yance did not have a significant impact on the verdict. *See State v. Shoop*, 441 N.W.2d 475, 481 (Minn. 1989) (holding that, when a jury instruction is erroneously omitted, a reviewing court examines all relevant factors to determine whether, beyond a reasonable doubt, the error did not have a significant effect on the verdict).

**B.    Self-Defense**

Appellant concedes that he did not request a jury instruction on self-defense but argues that "[t]he failure of the district court to provide the [self-defense] instruction affected [appellant's] substantial rights because the evidence against [appellant] was weak." *See Griller*, 583 N.W.2d at 740 (providing that the third element of the plain-

error test is whether the error affected the defendant's substantial rights). But J.L.'s testimony, appellant's testimony, and the testimony of the detectives who interviewed them refutes the assertion that the evidence against appellant was weak. Where a defendant "not only failed to request a self-defense instruction, but also failed to object to the trial court's failure to give such an instruction" and "did not argue self-defense at trial, or otherwise suggest a reliance on self-defense in questions to witnesses," there was no reason for the district court, sua sponte, to instruct on self-defense. *Gustafson*, 610 N.W.2d at 320.[3]

Appellant said he never saw the blade of J.L.'s knife; he did not mention being or feeling threatened by the knife, and none of the others present said anything about J.L. having a knife. Moreover, appellant himself, as well as the others, said that his animosity to J.L. was a result of J.L. having bragged about burning a truck and perhaps stolen some property, and that the animosity existed before J.L. even got into appellant's vehicle, certainly before he allegedly reached for the knife. The jury never heard the words "self-defense" mentioned in connection with J.L.'s knife: there would have been no reason to instruct it on self-defense. There was no error in the district court's failure to give the self-defense instruction.

## 2. Sentencing

Departures from presumptive sentences are reviewed under an abuse-of-discretion standard, but there must be "substantial and compelling circumstances" in the record to

---

[3] Unlike the defendant in *Gustafson*, appellant did give notice of his intent to argue self-defense, but he did not make that argument during trial.

justify a departure. *Rairdon v. State*, 557 N.W.2d 318, 326 (Minn. 1996). "Substantial and compelling circumstances are those demonstrating that the defendant's conduct in the offense of conviction was significantly more or less serious than that typically involved in the commission of the crime . . . ." *State v. Jones*, 745 N.W.2d 845, 849 (Minn. 2008) (quotation omitted).

First-degree assault occurs with the infliction of great bodily harm. Minn. Stat. § 609.221, subd. 1 (2012). "'Great bodily harm' means bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ, or other serious bodily harm." Minn. Stat. § 609.02, subd. 8 (2012).

The jury found that: (1) J.L. was subject to a high probability of death, to serious permanent disfigurement, to permanent impairment of a bodily function, and to other serious bodily harm; (2) appellant failed to seek medical attention for J.L., and (3) appellant was one of three or more participants in the crime. To impose an upward-double-durational departure, the district court relied chiefly on the first two factors, both indicia of the "particular cruelty" aggravating factor.[4] *See* Minn. Sent. Guidelines, 2.D.3.b.(2) (2012) (including as an aggravating factor "[t]he victim was treated with particular cruelty for which the individual offender should be held responsible"). "[A]

---

[4] The district court did not rely to an equal extent on the fact that appellant was part of a group of three or more persons who committed the crime. *See* Minn. Sent. Guidelines 2.D.3.b.(10) (2012) (including as an aggravating factor being part of a group of three or more persons that commits a crime). The district court said this was a "lesser factor" and that the "particular cruelty" factor was the important factor for the court. We therefore address that factor.

district court may use particular cruelty as a basis for departure only when the cruelty associated with the crime for which the defendant was convicted is of a kind not usually associated with the commission of the offense in question." *Tucker v. State*, 799 N.W.2d 583, 587 (Minn. 2011).

Appellant argues that (1) being subject to a high probability of death, (2) having a serious permanent disfigurement, (3) having a permanent impairment of a bodily function, and (4) having other serious bodily harm "are elements of first-degree assault and thus were already taken into account when the jury found [appellant] guilty" and that "the jury could not have found [him] guilty without finding each of these factors."[5] But appellant misreads the statute: these factors are disjunctive, not conjunctive, and any one factor is independently sufficient for a conviction. *See, e.g.*, *State v. Felix*, 410 N.W.2d 398, 400-01 (Minn. App. 1987) (affirming upward departure based on particular cruelty for rape and beating because of victim's disfiguring facial scars and because more than one of the great-bodily-harm factors were involved), *review denied* (Minn. Sept. 29, 1987).

Moreover, appellant provides no support for his implication that all four factors are "usually associated with the commission" of first-degree assault, *see Tucker*, 799 N.W.2d at 587, or are "typically involved in the commission of the crime." *Jones*, 745 N.W.2d at 848. The fact that J.L. suffered all four indicia of great bodily harm, i.e., high probability of death, a serious permanent disfigurement, a permanent impairment of a

---

[5] Appellant does not dispute the accuracy of the jury's findings on any of the four factors.

bodily function, and other serious bodily harm, is itself indicative of a first-degree assault committed with particular cruelty.

The jury, having heard that, although J.L. had significant head wounds, was bleeding from several places on his head, and was intermittently losing consciousness, appellant drove him not to a hospital but first to a house in Duluth and then to a trailer in Superior, where he left him, found that appellant had failed to seek medical attention for J.L. "[F]ailure to aid [e.g., seek medical attention] is relevant to whether a person convicted of a crime has acted in a particularly cruel manner . . ." *Tucker*, 799 N.W.2d at 587.[6] Thus, appellant's failure to seek medical help for J.L. is a further indication of particular cruelty.

The district court did not abuse its discretion in imposing an double-upward-durational departure on the basis of particular cruelty and did not err by not instructing the jury on accomplice testimony and self-defense.

**Affirmed.**

---

[6] Appellant also cites *Tucker* for the proposition that failure to seek aid "is not a departure factor by itself." In fact, *Tucker* noted "[w]e do not suggest that the failure to seek medical aid for a victim, standing alone, can never be the basis for an upward departure for particular cruelty" because behavior typical for one crime may be atypical, and therefore "particular cruelty," in the context of another crime. *Tucker*, 799 N.W.2d at 587 n.3.